FILED

APRIL 28, 2009
KAREN S. MITCHELL
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| DDD EXPLORATION, INC., | § § § § | |
| Plaintiff, | § § | |
| v. | § § | NO. 2:08-CV-001-J |
| KEY PRODUCTION COMPANY, INC., d/b/a KEY ENERGY COMPANY OF COLORADO, INC., | § § § § | |
| Defendant. | § § | |

**Memorandum Opinion**

Before the Court is a dispute arising from an oil field in Hardeman County, Texas. Plaintiff DDD Exploration, Inc. ("DDD") and Defendant Key Production Company, Inc. ("Key") are both oil and gas operators. Beginning in 2000, Defendant operated one of its wells, known as "Nichols Unit #1" as saltwater disposal well. Subsequently, Plaintiff drilled their "DDD-Evans #1" well on an adjacent tract. After a short period of oil production, this well began pumping water. These two wells – the Plaintiff's DDD-Evans #1 and Defendant's Nichols Unit #1 – are the subject of the present case.

DDD alleges that the saltwater injection from Key's well prevented DDD from recovering oil from its DDD-Evans #1 well. Key asserts a number of defenses to this claim, including statute of limitations. The case is now before the Court on Defendant's motion for summary judgment.

BACKGROUND

In 1998, Key drilled the Nichols Unit #1 well in the "Chappel Formation" in Hardeman County, Texas.  This well was a "dry hole" that only produced saltwater.  On March 23, 2000, Key decided to convert the Nichols #1 Well to a saltwater disposal well. The Texas Railroad Commission granted Defendant a permit allowing Key to convert the Nichols #1 Well into a 15,000 barrel per-day commercial saltwater disposal well. This permit was a public record available at the Railroad Commission.  In its application to obtain a saltwater disposal permit from the Railroad Commission, Key represented that the interval into which saltwater was to be disposed was not productive of oil or gas.

In April of 2004, DDD leased the 91.375 acres known at the "Evans Lease," neighboring the section where the Nichols #1 Well is located.  In May of 2005, DDD began its exploration of the Evans Lease with the drilling of the "Evans Unit #1" Well, which was a dry hole.

In February of 2006 DDD - through its agent - contacted Defendant and asked if Defendant would object to DDD's application for a Rule 37 exception.  This exception would allow DDD to drill even closer to the lease line than is typically permitted under the Texas Railroad Commission's rules.  Key did not object to this application.  DDD selected the DDD-Evans #1 location because it hoped to gain approximately 100 feet of structure to the highest well in field.[1]   In March of 2006, DDD began drilling the DDD-Evans #1 well and it was completed in May of 2006.  DDD-Evans #1 was located 300 feet from Key's Nichols #1 well.

DDD's DDD-Evans #1 well, like their Evans Unit #1 and Ley's Nichols Unit #1 well before it, was unsuccessful and produced almost entirely water.  On September 7, 2006, Key's Nichols #1 Well was shut-in at the request of DDD.  On November 8, 2006, the Railroad Commission hearing examiner ordered Key to shut-in the Nichols Well because it was injecting saltwater into a productive formation, rather than a non-productive formation as represented by

---

[1] The DDD-Evans #1 well in fact gained 88-93 feet of structure to the highest well in the field.

Key.  Currently, the DDD-Evans #1 Well is producing anywhere from about eight barrels of oil every two weeks to 20 barrels a month, and its production has not changed since Defendant ceased pumping saltwater.

On January 2, 2008, DDD filed its Original Complaint, but never served it upon Key.  On March 5, 2008, DDD filed its First Amended Complaint which was served on March 13, 2008. The royalty and other working interest owners all have assigned to DDD their right, title, and interest to all claims and causes of action they may have against Key for any damages to the reservoir under the Evans Lease.   DDD asserts its claim individually and as assignee of the royalty and working interest owners.

DDD alleges that the DDD-Evans #1 well and the Nichols #1 well are in pressure communication, and the saltwater injected into the Reservoir through the Nichols Well drowned the reservoir underlying DDD's well.  DDD further alleges that the saltwater injection precluded DDD from recovering oil from its well.  DDD seeks damages in the approximate amount of $13,000,000 resulting from the alleged loss of 210,000 barrels of oil that DDD estimates were displaced by Key's saltwater disposal.

All of DDD's claims flow from two allegations: (1) Key applied for the saltwater injection permit on the wrong form, or (2) Key trespassed and watered out the DDD-Evans #1 Well.  DDD brought eight causes of action:  1) trespass, 2) negligence, 3) negligence per se, 4) common law waste, 5) statutory waste, 6) statutory violation of Tex. Admin. Code § 3.46, 7) misrepresentations made to the Railroad Commission, and 8) violation of the Railroad Commission's permit.

Key moved for summary judgment on six counts: (1) All of Plaintiff's claims are barred by limitations, (2) Plaintiff has failed to show causation and damages, (3) Plaintiff's damages are

speculative as a matter of law, (4) Plaintiff does not have standing, (5) Plaintiff's claim for negligence per se fails as a matter of law, and (6) Plaintiff failed to mitigate damages.

DISCUSSION

1. SUMMARY JUDGMENT STANDARD

This Court may grant summary judgment on a claim if the record shows that there is no genuine issue of material fact and that "the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). A party who moves for summary judgment has the burden of identifying the parts of the pleadings and discovery on file that, together with any affidavits, show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the movant carries this burden, then the burden shifts to the nonmovant to show that the Court should not grant summary judgment. *Id.* at 324-25. The nonmovant must set forth specific facts that show a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The nonmovant cannot rely on conclusory allegations, improbable inferences, and unsupported speculation. *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1449 (5th Cir. 1993). The Court must review the facts and draw all inferences most favorable to the nonmovant. *Reid v. State Farm Mut. Auto Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

Summary judgment is also appropriate if "adequate time for discovery" has passed and a party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. The party moving for summary judgment must "demonstrate the absence of a genuine issue of material fact, 'but need not negate the elements of the nonmovant's case.'" *Little v. Liquid Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994), *quoting Celotex Corp.*, 477 U.S. at 323. The nonmovant must then show by affidavits, depositions, answers to interrogatories,

4

admissions on file, or other evidence that there is a genuine issue of material fact for trial. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## 2. STATUTE OF LIMITATIONS

Key moves that this Court dismiss all of DDD's claims as untimely under the relevant statute of limitations. Key claims that DDD's injury accrued in 2000 when Defendant began pumping saltwater in its Nichols Unit #1 well, and is thus beyond the two year statute of limitations.

Determining when a cause of action accrues is a question of law. *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex. 1990). A court must first decide whether an alleged injury to real property is permanent or temporary in order to make this determination. *Schneider Nat'l Carriers, Inc. v. Bates,* 147 S.W.3d 264, 270 (Tex. 2004). In this case, DDD alleges permanent injury to its reservoir cause by Key's saltwater injection. DDD claims it cannot recover oil because of this permanent injury. Key does not dispute that the injury alleged is a permanent injury.

All of DDD's causes of action are subject to a two-year limitations period. TEX. CIV. PRAC. & REM. CODE § 16.003.[2] Absent tolling, limitations begin to run and a cause of action typically accrues when a wrongful act causes legal injury, regardless of when the injury is first ascertainable. *S. V. v. R. V.*, 933 S.W.2d 1, 4 (Tex. 1996). Moreover, the action accrues and the statute of limitations begins to run "upon discovery of the first actionable injury and not on the date when the extent of the damages to the land are fully ascertainable." *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex.1984).

---

[2] *See also Krohn v. Marcus Cable Assocs.,* 201 S.W.3d 876, 880-81(Tex. App. Waco 2006, pet. denied) (trespass); *Darr Equip. Co. v. Allen,* 824 S.W.2d 710, 712 (Tex. App.—Amarillo 1992, writ denied) (negligence); *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 885 (Tex. 1998) (negligent misrepresentation); *Bayouth v. Lion Oil Co.,* 671 S.W.2d 867, 868 (Tex. 1984) (damage to land caused by salt water migration).

Key first injected saltwater into the Nichols #1 Well in 2000 and continued injecting through the time of DDD's drilling the DDD-Evans Well in 2006. Without tolling of the statute of limitations, DDD's complaint accrued in 2000 when Defendant began pumping saltwater. In order to avoid dismissal of this action as untimely, DDD argues the "discovery rule" tolls limitations. Although DDD pleaded other doctrines to toll the statute of limitations, they were not briefed, and are not considered by this Court.

"Discovery Rule"

The accrual of a cause of action may be postponed if the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable. *Computer Associates International, Inc. v. Altai, Inc.*, 918 S.W.2d 453,456 (Tex. 1996). This is known as the "discovery rule." *Id.* The discovery rule is restricted to exceptional cases to avoid defeating the purposes behind the limitations statutes despite due diligence. If the discovery rule is applicable, a cause of action does not accrue until a plaintiff knows or, through the exercise of reasonable care and diligence should have known of the wrongful act and resulting injury. *Childs v. Haussecker*, 974 S.W.2d 31, 36 (Tex. 1998). DDD argues that the statute of limitations must be tolled under the discovery rule until the DDD-Evans #1 well began drawing water in 2006. DDD contends that subsurface waste claims are inherently undiscoverable and objectively verifiable and thus in a category of injuries subject to the discovery rule.

If a plaintiff pleads the discovery rule as an exception to limitations, the defendant moving for summary judgment must negate it, either by demonstrating that the discovery rule does not apply, or by proving, as a matter of law, that there is no genuine issue of material fact as to when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the nature of his injury. *KPMG Peat Marwick v. Harrison County Hous. Fin. Corp.*,

988 S.W.2d 746, 748 (Tex. 1999).  Key contends that the discovery rule does not apply in this case because the alleged waste was neither inherently undiscoverable nor objectively verifiable.

"Inherently Undiscoverable"

An injury is inherently undiscoverable, for purposes of the discovery rule, if it is, by its nature, unlikely to be discovered within the prescribed limitations period despite due diligence. *Via Net, U.S. v. TIG Insurance Co.*, 211 S.W.3d 310, 313 (Tex. 2006).  "Inherently undiscoverable" does not mean that a particular plaintiff did not discover his or her particular injury within the applicable limitations period. *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex. 2001).  Instead, this Court is to decide whether an injury is inherently undiscoverable on a categorical basis because such an approach "brings predictability and consistency to the jurisprudence." *Id*. Thus, the question here is whether damage to an oil reservoir is "the type of injury that generally is discoverable by the exercise of reasonable diligence." *Id*.

Defendant points to *HECI Exploration Co. v. Neel* to show that the discovery rule does not apply to the present action because the injury is not categorically undiscoverable.[3] *HECI Exploration Co. v. Neel*, 982 S.W.2d 881 (Tex.1998).  In *HECI*, the lessee (HECI) of an oil field failed to notify the royalty owners (the Neel family) of the need to sue an operator of adjoining lease.  *Id* at 883.  In 1988, HECI obtained a judgment against an operator of an adjacent oil lease (AOP) for overproduction.  The Neels did not learn of the suit between HECI and AOP until May 1993. *Id* at 884.  They sued HECI in December 1993, more than four years after the release

---

[3] DDD relies heavily on *Exxon Corp. v. Miesch*. *Exxon Corp. v. Miesch*, 180 S.W.3d 299 (Tex. App.-Corpus Christi 2005).  In <u>Miesch</u>, the defendants had engaged in a deliberate pattern of sabotaging the wells in their field to prevent reentry while continuing to profit from operations on the contiguous tract.  *Id* at 312.  This damage could not be determined by visual inspection or a review of the publicly available records.  *Id*.  Such intentional, malicious, and hidden damage is clearly distinguishable from this case.  Further, this case was reversed, with the Texas Supreme Court holding that the Plaintiffs had actual knowledge of the damaged wellbores as a matter of law.  *Exxon Corp. v. Emerald Oil & Gas Co., L.C.,* 52 Tex. Sup. Ct. J. 467 (Tex. Mar 27, 2009).  The Court did not decide whether the discovery rule applied.

of judgment against AOP was filed of record and more than four years after the damage to the reservoir occurred.  The Neels alleged that the discovery rule should apply to forestall the application of statutes of limitations to their claims. *Id*.  The causes of action alleged by the Neels included: breach of contract, for which they sought a 1/6 royalty based on the amount of the judgment against AOP; negligent misrepresentation because of HECI's failure to disclose information about either the illegal production or the suit; breach of an implied covenant to protect against drainage that was alleged to include an obligation of HECI to sue AOP on behalf of the Neels; and unjust enrichment for retaining compensation from AOP that was attributable to the Neels' interest.  The lengthiest statute of limitations for any the Neels' causes of action was four years.

Similarly to the present case, the damage alleged in *HECI* was the "permanent loss of oil and gas reserves that otherwise could have been recovered through HECI's well." *Id*.  The Texas Supreme Court held that the royalty owners could "not be oblivious to the existence of other operators in the area or the existence of a common reservoir." *Id* at 886.  As a result, the cause of action against HECI for failure to notify the royalty owners, accrued when AOP's illegal overproduction had ceased, at the latest. *Id* at 885.  Thus, the Court held that such damage to the common reservoir was not inherently undiscoverable, and that mineral interest owners have an obligation to exercise reasonable diligence in protecting their interest.

Damage to a common reservoir is not in the category of claims where the discovery rule applies.  In *Computer Associates Intern., Inc. v. Altai, Inc*, the Texas Supreme Court noted that "[w]hile some trade secret misappropriations might not be quickly discovered, this isolated fact does not alter the reality that, in most cases, trade secret misappropriation generally is capable of detection within the time allotted for bringing such suits." *Altai*, 918 S.W.2d at 453.  This Court

similarly notes that while some damage to a common reservoir might not be quickly discovered, this isolated fact does not alter the reality that in most cases, reservoir damage is capable of detection within the time allotted for bringing such suits.  *Altai*, 918 S.W.2d at 457, *See also HECI,* 982 S.W.2d at 881 (Where an oil lessee timely noticed damage to a common aquifer and brought suit).

Furthermore, Plaintiff did not act with reasonable diligence, as required by the discovery rule.  *Wagner & Brown,* 58 S.W.3d at 734 (Tex. 2001) ("The discovery rule exception operates to defer accrual of a cause of action until the plaintiff knows or, by exercising reasonable diligence, should know of the facts giving rise to the claim").  Before DDD started drilling the DDD-Evans Unit #1 in May, 2005, it was aware that the RRC had granted to Key a permit to use the Nichols #1 Well for saltwater disposal. The permit and permit application were a matter of public record. DDD's President, Thomas Ratliff, testified that before drilling the DDD-Evans #1, he was aware of the Railroad Commission records.  Similarly to *HECI*, knowledge of saltwater pumping, along with Railroad Commission records, are sufficient for knowledge of an injury, or at least sufficient to give rise to a reasonable cause to investigate whether an injury has taken place.  The failure to investigate such an injury in a timely manner shows a lack of diligence on the part of DDD and the mineral rights owners.

## "Objectively Verifiable"

Even if the injury were inherently undiscoverable, this Court further concludes it was not objectively verifiable.  A principal factor in deciding whether to apply the discovery rule has been to what extent the claim was objectively verifiable. *S.V. v. R.V.*, 933 S.W.2d at 6, citing *Gaddis v. Smith*, 417 S.W.2d 577, 581 (Tex. 1967) (Holding that leaving a surgical sponge in a body "is a peculiar type of case which is not particularly susceptible to fraudulent prosecution");

Robinson v. Weaver, 550 S.W.2d 18, 21 (Tex. 1977).  ("Unlike *Gaddis v. Smith*, there exists in the present case [alleging misdiagnosis of herniated intervertebral disc] no physical evidence which in-and-of-itself establishes the negligence of some person."); *Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex. 1976) (credit defamation clear from written report).  Requiring objective verifiability assures that the policy underpinnings of statutes of limitations are met by balancing the possibility of stale or fraudulent claims against individual injustice.  *Altai,* 918 S.W.2d at 457-58.

Expert testimony alone does not supply the objective verification of wrong and injury necessary for application of the discovery rule. *S.V. v. R.V.*, 933 S.W.2d at 7.  In other words, an injury is "objectively verifiable," for purposes of the discovery rule deferring accrual of a cause of action, if the presence of injury and the producing wrongful act cannot be disputed, and the facts upon which liability is asserted are demonstrated by direct, physical evidence.  *Altai,* 918 S.W.2d at 455.  While expert testimony alone does not suffice to establish that an injury is objectively verifiable for purposes of the discovery rule, recognized expert opinion on a particular subject could be so near consensus that, in conjunction with objective evidence, it could provide the verification required.  *S.V. v. R.V.*, 933 S.W.2d at 15.

This injury, however, is not objectively verifiable.  In *Robinson v. Weaver*, the Texas Supreme Court ruled that the discovery rule did not apply to a negligent physician diagnosis because it was subject to proof only by expert hindsight.  *Robinson*, 550 S.W.2d at 22.  In the same manner, DDD has provided expert testimony from Keith Selinger supporting the proposition that Defendant did in fact wrongly displace oil.  Selinger has only provided expert hindsight; in his expert opinion, there was oil was there.  He believes the oil has migrated from underneath the DDD-Evans #1 Well to the east, but does not know where it has migrated.  He

says that he knows that "the oil" was flushed because that is how saltwater injection wells react. However, Selinger does not know what volume of water would be required to cause that migration of oil.  He does not know how much pressure would be needed to flush or displace the 210,000 barrels he estimates should be recovered out of a reservoir and has not done any pressure calculations in that regard.  Neither can he why the Evans Unit #1 Well, located to the east of DDD-Evans #1 Well, did not pick up a portion of this flushed oil.  He cannot say if most of the 210,000 barrels are still under the DDD-Evans #1 Well.  Additionally, Selinger believes some of the 210,000 barrels in his damage model is still in pockets under the DDD-Evans #1 Well, but cannot say how much is still there or give any estimate within an order of magnitude. Although Selinger opines as to the amount of recoverable oil prior to the saltwater injection, Selinger cannot quantify how much oil has been flushed or how much remains under the DDD Evans #1 Well; he states that "he cannot quantify it at this point."  Selinger implicity admitted that the injury is not objectively verifiable, noting that simply because there are hydrocarbons visible on a seismic map, one cannot know in advance of drilling if any are there because "you can't look underground and see."

Selinger has failed to justify his belief with any data that additional reserves were producible by the DDD-Evans #1 Well, or any other well in the region.  The oil field where DDD's well is located has not had a single productive well located within its boundaries since 1998.  At the time DDD decided to drill its well, there had not been a productive well in the area in nine years.  The last two wells, including one well drilled by DDD have been dry holes. Selinger does not know of any other instances in the Hardeman Basin where the recovery factor is the same as his assumption of 180 barrels per acre foot.

Prior to drilling the DDD-Evans #1 well, DDD drilled the Evans Unit #1 well.  Thomas Ratliff had estimated that the Evans Unit #1 well would produce 500,000 barrels of oil.  It was a dry hole.  In their disclosure to investors, DDD noted that the DDD-Evans #1 was even more speculative than the Evans Unit #1.  Even Plaintiff's counsel acknowledges that the exact nature of the injury is somewhat enigmatic: "it is impossible to determine at what specific time the injection of saltwater into the Reservoir caused the drowning of the Reservoir underlying the Evans Well."  Brief in Support of Plaintiffs Response to Defendant's Motion for Summary Judgment, pg. 5-6 (Docket No. 33).  Ultimately, drilling for oil is an inherently speculative enterprise.  By its very nature, injuries to a subterranean reservoir are not objectively verifiable for the purposes of the discovery rule.

For these reasons, the discovery rule does not toll the statute of limitations.  All of DDD's claims are untimely and judgment will be entered for the defendant.

Signed this 28th day of April 2009.

/s/ Mary Lou Robinson
MARY LOU ROBINSON
UNITED STATES DISTRICT JUDGE